**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

SANDRA S. WEYER,

                    Plaintiff,

        -against-

UNITED STATES OF AMERICA,

MERRICK GARLAND, individually,

MATTHEW GRAVES, individually,

and

FDC PHILADELPHIA DOES 1-10, consisting of the warden, associate wardens, unit managers, correctional officers, food-service officials, medical personnel, and facilities personnel responsible for the complained-of conditions,

                    Defendants.

Civil Action No.


JURY TRIAL DEMANDED

## COMPLAINT

Plaintiff SANDRA S. WEYER (hereinafter, "Plaintiff" or "Weyer") by and through her attorneys, Raiser, Kenniff & Lonstein, P.C., brings this Complaint and respectfully alleges as follows:

## NATURE OF THE ACTION

1. This is a civil action for damages arising from Defendants' violations of Plaintiff's rights under the United States Constitution, as well as for tortious conduct actionable under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.

2. Plaintiff was targeted, arrested, prosecuted, and punished because of her constitutionally protected expressive and associational activity as a member of the protesters who gathered at the Capitol on January 6th, 2021 (hereinafter, the group of people prosecuted for their activities at or near the Capitol Building on January 6th, 2021, will be referred to as the "January 6th Defendants"). Defendants selectively and disproportionately exercised governmental authority against Plaintiff as part of a broader campaign directed at January 6th Defendants. Through retaliatory prosecution, discriminatory detention practices, deliberate indifference to Plaintiff's health and safety, and other unlawful conduct, Defendants violated Plaintiff's constitutional rights and caused severe physical, emotional, reputational, and economic injury.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346(b).

4. Jurisdiction over Plaintiff's constitutional claims against individual federal officers is conferred by *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971) ("*Bivens*"), and its progeny.

5.      Jurisdiction over Plaintiff's claims against defendant UNITED STATES OF AMERICA (the "United States") is conferred by the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680.

6.      Venue is proper in this District pursuant to 28 U.S.C. § 1391(e) because the act or omission complained of occurred in this District.

7.      On or about August 5, 2025, Plaintiff transmitted three administrative Notices of Claim to the United States Department of Justice ("DOJ") setting forth the factual basis for her claims and demanding a sum certain. More than six months elapsed without final denial.

8.      As of the date of this Complaint, the United States failed to settle or issue a final denial of Plaintiff's claims within the statutory period. More than 180 days had elapsed, resulting in constructive exhaustion under 28 U.S.C. § 2675(a).

## PARTIES

9.      Plaintiff is a United States citizen and resident of Cumberland County, State of Pennsylvania.

10.     Defendant UNITED STATES OF AMERICA is sued pursuant to the FTCA for tortious acts and omissions of federal employees acting within the scope of their employment.

11.     Defendant MERRICK GARLAND ("Garland") is sued in his individual capacity for actions taken while serving as Attorney General of the United States.

12.     Defendant MATTHEW M. GRAVES ("Graves") is sued in his individual capacity for actions taken while serving as United States Attorney for the District of Columbia.

13.     FDC PHILADELPHIA DOES 1-10, individually, include the warden, associate wardens, unit managers, correctional officers, food-service officials, medical personnel, and facilities personnel responsible for the complained-of conditions at Federal Detention Center Philadelphia.

3

**FACTUAL ALLEGATIONS**

14.    Plaintiff Sandra Weyer is a lifelong Pennsylvania resident, a mother of two adult sons, and a grandmother. She was born into a large working-class family and overcame significant difficulties early in life before building a stable marriage, family, and community life. By the time of the events alleged herein, she had been married for nearly four decades, had no criminal history, and was widely known by friends and neighbors as calm, rational, dependable, and law-abiding. Those who knew her regarded her conduct on January 6 as profoundly out of character.

15.    For years, Plaintiff devoted substantial time and personal resources to helping others. After Plaintiff's stepfather died, she became the primary caregiver for her elderly mother and remained deeply involved in her day-to-day care. During the COVID-19 pandemic, she assisted elderly and vulnerable neighbors with shopping, appointments, and errands; helped frightened community members regain confidence leaving their homes; organized neighborhood support efforts; and used her own resources to raise money for struggling local businesses. One restaurant owner credited Plaintiff's repeated efforts to bring customers to the restaurant with helping keep the business open and preserving jobs relied upon by single mothers. Plaintiff also helped organize CPR and first-aid instruction and routinely provided rides, groceries, cleaning assistance, and financial support to people in need.

16.    On January 6, 2021 a joint session of the United States Congress convened at approximately 1:00 p.m. to certify the Electoral College vote of the 2020 Presidential Election.

17.    On that day Plaintiff traveled to Washington, D.C. in a group and attended the events of that day to exercise her First Amendment rights by attending a political rally and protesting the certification of the Electoral College vote.

4

18.    Plaintiff entered the United States Capitol after barriers had already been breached by others and remained inside for approximately eleven minutes, most of which she spent searching for her brother, with whom she had lost contact in the tumult of the day.

19.    Plaintiff was unarmed and did not assault law enforcement, did not damage property, and did not enter the Senate chamber or other congressional chambers.

20.    On June 28, 2021, approximately eight to ten FBI agents, accompanied by local police officers, executed Plaintiff's arrest warrant at her Pennsylvania home. Agents arrived with rifles and a riot shield, taped over Plaintiff's Ring doorbell camera, handcuffed and leg-shackled her, and transported her to a federal building in Harrisburg, Pennsylvania.

21.    Plaintiff remained shackled for approximately nine hours before her initial appearance and release on personal recognizance. Thereafter, she remained on restrictive pretrial supervision for roughly two and a half years, during which she had to report to probation, was prohibited from leaving the Middle District of Pennsylvania without permission, and was subjected to drug testing despite no history of drug use.

22.    Plaintiff voluntarily complied with every condition imposed by the Court throughout the criminal proceedings, appeared for every required court appearance, and ultimately self-surrendered to begin serving her sentence.

23.    The criminal complaint against Plaintiff was unsealed on June 28, 2021 and the criminal case against Plaintiff proceeded in the United States District Court, District of Columbia, under Case No. 22-cr-40.

24.    A grand jury returned an indictment on February 2, 2022. Plaintiff was charged with violating:

   a.  18 U.S.C. § 1512(c)(2): Obstruction of an Official Proceeding;

5

b.  18 U.S.C. § 1752(a)(1): Entering and Remaining in a Restricted Building or Grounds;

c.  18 U.S.C. § 1752(a)(2): Disorderly and Disruptive Conduct in a Restricted Building or Grounds;

d.  40 U.S.C. § 5104(e)(2)(D): Disorderly Conduct in a Capitol Building; and

e.   40 U.S.C. § 5104(e)(2)(G): Parading, Demonstrating, or Picketing in a Capitol Building.

25.     Notably, Plaintiff was charged with violating 18 U.S.C. § 1512(c)(2), obstruction of an official proceeding.

26.     Aside from the charge under 18 U.S.C. § 1512(c)(2), all of the Plaintiff's criminal charges were misdemeanors.

## THE GOVERNMENT CONVERTED PLAINTIFF'S POLITICAL SPEECH INTO A FELONY DISTINCTION

27.     Plaintiff traveled to Washington, D.C. with two other people, Lynwood Nester and Brian Korte. The three remained together throughout the day and throughout the events at the Capitol, and entered and exited the Capitol Building together.

28.     However, Nester and Korte were each charged with only misdemeanor offenses. Only Plaintiff was charged under 18 U.S.C. § 1512(c)(2), a felony offense carrying a maximum sentence of twenty years.

29.     The Government's use of the § 1512 charge materially increased Plaintiff's sentencing exposure. For example, the Government requested a sentence for Korte of only 30 days (he ultimately received a sentence of only 21 days). By contrast, the Government requested a sentence for Plaintiff of 30 months.

6

30. The Government did not justify this dramatically different charging decision by pointing to materially different conduct. It never claimed Plaintiff committed violence, remained inside substantially longer, entered more sensitive areas of the Capitol, or otherwise engaged in conduct materially different from her companions.

31. Instead, the Government treated Plaintiff's clearer articulation of her political purpose as the feature that transformed otherwise comparable conduct from misdemeanor trespass and disorderly conduct into a federal felony.

32. In other words, the Government impermissibly used the content of Plaintiff's political speech as a substitute for the elements of a felony offense. Plaintiff's opposition to certification, her knowledge of the proceeding, and her political rhetoric did not constitute evidence destruction, document impairment, or any comparable act affecting the availability or integrity of evidence.

33. The felony charge also changed the publicity Plaintiff received for her criminal case. Plaintiff was placed in the same broad category as other January 6th Defendants accused of coordinated and violent efforts to interfere with the transfer of presidential power, even though Plaintiff was charged individually and was not charged with conspiracy, assault, weapons possession, or property destruction.

34. Plaintiff's case proceeded to a bench trial before Chief Judge James E. Boasberg on June 5 and 6, 2023. At the conclusion of trial on June 6, 2023, the Court found Plaintiff guilty on all five counts.

35. On September 14, 2023, the Court sentenced Plaintiff to fourteen (14) months' imprisonment on Count One, concurrent terms on Counts Two through Five, one year of

7

supervised release, restitution in the amount of $2,000, and special assessments. Plaintiff remained on release until she self-surrendered in or about November 2023.

36.    Although Plaintiff had expected placement in a minimum-security women's facility, she was instead designated to the Federal Detention Center in Philadelphia ("FDC Philadelphia"), a far more restrictive institution. She remained there from approximately November 2023 until her release on February 27, 2024.

37.    During her incarceration at FDC Philadelphia, Plaintiff was subjected to severe and unsafe conditions. She observed cockroaches and mice in the housing area, found cockroaches in her bed, and encountered black mold in cells, showers, and common areas. Toilets overflowed, electrical outlets exposed live wires, and inmates lacked adequate cleaning supplies.

38.    Plaintiff was served food that she describes as spoiled, inedible, and at times infested with weevils and maggots. Because she could not tolerate the food, she alleges that she lived largely on commissary snacks for roughly three and a half months.

39.    Plaintiff was also exposed to rampant synthetic-drug smoke, including K2, from other inmates. She alleges that the exposure caused severe migraines, nausea, and ongoing distress, and that staff failed to stop or report the conduct.

40.    Plaintiff further alleges that she was provided inadequate clothing and bedding, was assigned an upper bunk notwithstanding her age, had no meaningful access to sunlight during the entirety of her incarceration, and was denied ordinary hygienic necessities during portions of her confinement.

41.    As a result of the prosecution and incarceration described above, Plaintiff alleges she suffered loss of liberty, severe emotional distress, humiliation, fear, physical pain, migraines, damage to reputation, financial injury, loss of opportunities, and lasting trauma.

42. Shortly after her conviction, Plaintiff appealed her conviction under 18 U.S.C. § 1512(c)(2), the most serious charge Plaintiff was convicted of and the only felony charge Plaintiff was convicted of.

43. On December 31, 2023, Plaintiff moved for release pending appeal after serving the sentence that this Court commonly imposed for misdemeanor-only January 6 Defendants.

44. The Government nevertheless opposed Plaintiff's release pending appeal, arguing that despite her complete compliance with every condition of release and her voluntary self-surrender, she now presented a flight risk because she had experienced incarceration and would not want to return to prison.

45. The Court rejected the Government's argument and, on February 27, 2024, granted Plaintiff's motion and ordered her released forthwith.

46. On June 28, 2024, the Supreme Court decided *Fischer v. United States* and substantially narrowed the application of 18 U.S.C. § 1512(c)(2). On September 9, 2024, the Court of Appeals issued its mandate vacating Plaintiff's conviction under § 1512(c)(2) and remanding for further proceedings.

47. On October 30, 2024, the District Court entered an amended judgment removing Plaintiff's sole felony conviction and leaving only four misdemeanor convictions.

## THE GOVERNMENT'S JANUARY 6 ENFORCEMENT CAMPAIGN

48. Following January 6, 2021, the United States Department of Justice publicly announced that the investigation and prosecution of January 6th Defendants would constitute one of the largest criminal enforcement efforts in the history of the Department.

49.     At all relevant times, Defendant Merrick Garland served as Attorney General of the United States and exercised supervisory authority over Department-wide policies concerning January 6th investigations and prosecutions.

50.     At all relevant times, Defendant Matthew Graves served as United States Attorney for the District of Columbia and exercised supervisory authority over January 6th prosecutions within the District of Columbia.

51.     Throughout their respective tenures, Garland and Graves repeatedly described January 6th prosecutions as among the Department's highest priorities and publicly emphasized the importance of those prosecutions in official statements, media appearances, congressional testimony, and Department of Justice communications.

52.     Upon information and belief, Garland and Graves approved, implemented, supervised, ratified, or knowingly permitted investigative, charging, detention, plea-negotiation, sentencing, and appellate policies applicable to January 6 defendants, including Plaintiff.

53.     Upon information and belief, Garland and Graves approved or ratified the Department's widespread use of 18 U.S.C. § 1512(c)(2) despite substantial judicial disagreement concerning the scope of that statute and despite knowing that the charge materially increased detention exposure, sentencing exposure, and prosecutorial leverage.

54.     Throughout Plaintiff's prosecution, Defendants relied upon an expansive interpretation of 18 U.S.C. § 1512(c)(2) to dramatically increase Plaintiff's criminal exposure. That charging theory substantially increased Plaintiff's sentencing risk, affected detention decisions, enhanced the public significance of the prosecution, and provided Defendants with considerable leverage throughout the criminal proceedings. The Supreme Court ultimately rejected that

10

expansive interpretation in *Fischer v. United States*, confirming that the Government's principal charging theory exceeded the statute's proper scope.

55.     Plaintiff alleges that these policies subjected January 6th Defendants, including Plaintiff, to materially harsher investigative, charging, detention, and sentencing practices than similarly situated criminal defendants and were intended, at least in part, to maximize deterrent effect and public example-making.

## AS AND FOR A FIRST CAUSE OF ACTION
*First Amendment Retaliation and Viewpoint Discrimination* – Bivens
*Federal Individual Defendants*

56.     Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

57.     At all relevant times, Plaintiff engaged in activity protected by the First Amendment, including participating in political speech, attending a political demonstration, expressing political viewpoints concerning the 2020 Presidential Election.

58.     Defendants Garland, Graves, and the John Doe Defendants (the "DOJ Defendants"), acting personally and through policies they approved, implemented, supervised, or knowingly permitted, intentionally subjected Plaintiff to materially harsher investigative, charging, prosecutorial, and sentencing practices because of her actual and/or perceived political viewpoints and expressive activity.

59.     Defendants employed the expansive interpretation of 18 U.S.C. § 1512(c)(2), together with enhanced charging practices and litigation strategies, to increase Plaintiff's detention exposure, sentencing exposure, public stigma, collateral consequences, and plea-bargaining pressure.

60.     The Government's repeated public statements describing January 6 prosecutions as a principal enforcement priority, together with its emphasis upon deterrence and public example-

11

making, demonstrate that DOJ Defendants intended not merely to prosecute alleged criminal conduct, but also to discourage similarly situated individuals from engaging in comparable political expression and association.

61.     According to the Government itself, the Government treated Plaintiff differently from similarly situated criminal defendants, specifically Lynwood Nester and Brian Korte, because of Plaintiff's political ideas and political speech.

62.     No legitimate governmental interest justified imposing materially different investigative, charging, and prosecutorial treatment upon Plaintiff because of her protected speech, expressive conduct, political viewpoints, or organizational associations.

63.     DOJ Defendants' actions would deter a person of ordinary firmness from engaging in protected political speech, assembly, petitioning activity, or association out of fear of being subjected to disproportionately severe governmental investigation or prosecution.

64.     As a direct and proximate result of DOJ Defendants' unconstitutional conduct, Plaintiff suffered loss of liberty, emotional distress, reputational injury, economic loss, loss of professional opportunities, and other compensable damages.

65.     Accordingly, Plaintiff is entitled to recover compensatory damages and, as against the individual Defendants, punitive damages.

## AS AND FOR A SECOND CAUSE OF ACTION
*Malicious Prosecution - FTCA*

66.     Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

67.     This claim is asserted solely against Defendant UNITED STATES OF AMERICA ("United States") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671-2680.

68.     Acting through federal investigative and law-enforcement personnel acting within the scope of their employment, Defendant United States caused criminal proceedings to be

12

initiated and continued against Plaintiff under 18 U.S.C. § 1512(c)(2) in *United States v. Weyer*, No. 22-cr-40 (D.D.C.).

69. The conduct giving rise to this claim includes the investigation, presentation, and continued pursuit of the § 1512(c)(2) obstruction charge, separate and apart from any other criminal charges asserted against Plaintiff.

70. At all relevant times, federal officials knew or should have known that substantial legal questions existed regarding the scope and applicability of 18 U.S.C. § 1512(c)(2) to the conduct alleged against Plaintiff.

71. Nevertheless, federal officials continued pursuing the charge through pretrial proceedings, trial, sentencing, and appeal despite serious questions concerning whether Plaintiff's alleged conduct fell within the proper scope of the statute.

72. Federal officials acted with malice and for improper purposes, including securing enhanced detention exposure, increased sentencing exposure, and increased prosecutorial leverage beyond that otherwise available under the remaining charges.

73. Following the Supreme Court's decision in *Fischer v. United States*, Plaintiff's conviction under 18 U.S.C. § 1512(c)(2) was vacated and remanded for further proceedings.

74. But for the charge under 18 U.S.C. § 1512(c)(2), Plaintiff would have been charged with and convicted of only misdemeanors and been subjected to a much different sentencing structure with a much lower maximum sentence.

75. As a direct and proximate result of the malicious prosecution of Plaintiff under § 1512(c)(2), Plaintiff suffered loss of liberty, emotional distress, reputational injury, economic loss, legal expenses, and other damages.

76.     Pursuant to the FTCA, Defendant United States is liable for those injuries and damages.

## AS AND FOR A THIRD CAUSE OF ACTION
*Abuse of Process – FTCA*

77.     Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

78.     This claim is asserted solely against Defendant the United States pursuant to the Federal Tort Claims Act.

79.     Acting through investigative and law-enforcement personnel acting within the scope of their employment, Defendant United States employed and continued criminal process against Plaintiff for purposes beyond the legitimate adjudication of criminal liability.

80.     Upon information and belief, federal officials employed and maintained criminal process not solely to adjudicate Plaintiff's individual criminal liability, but also to increase public stigmatization of Plaintiff, maximize the symbolic and deterrent value of January 6 prosecutions, enhance prosecutorial leverage through guilt-by-association, and increase Plaintiff's detention and sentencing exposure through the continued pursuit of 18 U.S.C. § 1512(c)(2).

81.     Throughout Plaintiff's prosecution, Defendants relied upon an expansive interpretation of 18 U.S.C. § 1512(c)(2) to dramatically increase Plaintiff's criminal exposure. That charging theory substantially increased Plaintiff's sentencing risk, affected detention decisions, enhanced the public significance of the prosecution, and provided Defendants with considerable leverage throughout the criminal proceedings.

82.     The Government used Plaintiff's conviction under 18 U.S.C. § 1512(c)(2) to argue for a substantially longer sentence than other January 6th Defendants who engaged in actions comparable to Plaintiff, specifically Brian Korte.

14

83.    The Government continued to oppose the release of Plaintiff even after the Supreme Court accepted review of the Government's charging theory under 18 U.S.C. § 1512(c)(2), which made Plaintiff's conviction under the statute seriously doubtful.

84.    The Supreme Court ultimately rejected that expansive interpretation in *Fischer v. United States*, confirming that the Government's principal charging theory exceeded the statute's proper scope.

85.    Even when the Supreme Court rejected the Government's theory, the Government argued that instead of release Plaintiff should be sentenced to an additional nine months of home incarceration.

86.    As a direct and proximate result of that abuse of process, Plaintiff suffered loss of liberty, emotional distress, reputational injury, economic loss, litigation expenses, and other damages.

87.    Pursuant to the FTCA, Defendant United States is liable for those injuries and damages.

## AS AND FOR A FOURTH CAUSE OF ACTION
*Fifth Amendment Equal Protection* – Bivens
*Selective Enforcement, Viewpoint Discrimination, and Unequal Treatment*
*Federal Individual Defendants*

88.    Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

89.    Defendants Garland and Graves (the "DOJ Defendants") personally participated in, approved, implemented, supervised, ratified, or knowingly permitted Department of Justice policies and practices governing the investigation, charging, detention, prosecution, and sentencing of January 6th Defendants, including Plaintiff.

90.    Upon information and belief, those policies included the widespread use of 18 U.S.C. § 1512(c)(2), aggressive detention positions, enhanced charging decisions, and litigation

15

strategies designed to increase detention exposure, sentencing exposure, prosecutorial leverage, public deterrence, and public example-making in January 6th cases.

91.    Plaintiff alleges that the DOJ Defendants intentionally subjected some January 6th Defendants, including Plaintiff, to investigative, charging, detention, and prosecutorial practices materially different from those employed against similarly situated criminal defendants because of their actual or perceived political viewpoints, associations, and participation in events occurring on January 6, 2021.

92.    For example, Plaintiff received substantially harsher criminal penalties and/or a longer sentence than other January 6th Defendants who engaged in similar conduct, specifically Brian Korte and Lynwood Nester solely because, as the Government itself has stated, of Plaintiff's political speech and political beliefs.

93.    Upon information and belief, the DOJ Defendants received regular briefings concerning January 6th investigations and prosecutions, were aware of the policies challenged herein, and knowingly approved, ratified, or permitted their continued implementation.

94.    No sufficient governmental interest justified the disparate treatment imposed upon Plaintiff. In the alternative, Defendants lacked a rational basis for treating Plaintiff differently from similarly situated defendants prosecuted for comparable conduct.

95.    The DOJ Defendants' conduct violated the equal protection component of the Fifth Amendment and directly and proximately caused Plaintiff to suffer loss of liberty, emotional distress, reputational injury, economic loss, and other damages.

## AS AND FOR A FIFTH CAUSE OF ACTION
*Eighth Amendment*
*Deliberate Indifference/Unconstitutional Conditions of Confinement*

96.    Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

16

97.    During her confinement at FDC Philadelphia from approximately November 2023 through February 27, 2024, Plaintiff was subjected to conditions that posed a substantial risk of serious harm to her health and safety.

98.    Plaintiff was housed in an environment infested with vermin, including cockroaches and mice. She observed cockroaches in the housing unit, found cockroaches in her bed, and was forced to live in close proximity to unsanitary and pest-ridden conditions for an extended period.

99.    Plaintiff was also exposed to black mold in cells, ceilings, showers, and common areas, as well as recurrent flooding and overflowing toilets. Cleaning materials were inadequate or unavailable, and dirty mops were repeatedly used on contaminated floors, exacerbating the unsanitary conditions.

100.    The food provided to Plaintiff was frequently spoiled, inedible, and at times infested with weevils, maggots, or other contamination. Because she could not safely or reasonably consume the meals provided, Plaintiff was forced to subsist largely on commissary snacks for roughly three and a half months.

101.    Plaintiff was regularly exposed to synthetic-drug smoke, including K2, from other inmates. That exposure caused Plaintiff severe migraines, headaches, nausea, and ongoing distress, yet staff failed to stop, report, or meaningfully respond to the drug use.

102.    Plaintiff was further subjected to unsafe and degrading living conditions, including inadequate bedding and clothing, freezing temperatures, shoes that did not fit, assignment to an upper bunk despite her age, denial of ordinary hygiene items, lack of clean clothing, and no meaningful access to sunlight for the entirety of her incarceration.

103. Plaintiff also observed unsafe electrical conditions, including torn or damaged outlets and exposed live wires, and lived in constant fear of electrocution or fire while locked in her cell.

104. Defendants FDC Does 1-10 knew of, observed, or recklessly disregarded these conditions and the serious risks they posed. Despite the obviousness of the hazards and Plaintiff's resulting suffering, they failed to take reasonable steps to abate the vermin infestation, mold, flooding, contaminated food, drug exposure, sanitation failures, and deprivation of basic hygiene and medical attention.

105. The dangerous and degrading conditions described herein were longstanding, obvious, and pervasive. Defendants FDC Does 1-10 were aware of those conditions, or recklessly disregarded them, yet failed to remedy them, failed to protect Plaintiff from them, and failed to provide basic sanitation, hygiene, and medical attention despite the substantial risk of serious harm

106. As a direct and proximate result of these conditions and Defendants' deliberate indifference, Plaintiff suffered physical pain and illness, including migraines, headaches, nausea, eye and nose irritation, respiratory distress, sleep disruption, and other physical symptoms, as well as severe emotional and psychological injuries including anxiety, panic, fear for her safety, humiliation, insomnia, and persistent psychological distress.

107. The conditions under which Plaintiff was confined were objectively serious, unnecessary, and punitive, and deprived Plaintiff of the minimal civilized measure of life's necessities in violation of the Eighth Amendment.

108. By reason of the foregoing, Plaintiff is entitled to compensatory damages, costs, disbursements, and such other and further relief as the Court deems just and proper.

## AS AND FOR A SIXTH CAUSE OF ACTION
*Negligence – FTCA*

109.    Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

110.    This claim is asserted solely against Defendant UNITED STATES OF AMERICA ("United States") pursuant to the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b), 2671–2680.

111.    At all relevant times, employees, agents, correctional personnel, medical personnel, and administrators of the Federal Bureau of Prisons and FDC Philadelphia were acting within the scope of their federal employment.

112.    Defendant United States owed Plaintiff a duty to exercise reasonable care for her safety, health, medical treatment, custody, and general well-being while she was incarcerated in federal custody.

113.    Defendant United States further owed Plaintiff a duty to provide reasonably safe conditions of confinement, reasonably habitable and sanitary living conditions, and reasonable nutrition consistent with applicable regulations and institutional policies.

114.    Defendant United States, through its employees and agents, failed to take reasonable measures to provide reasonable conditions of confinement to Plaintiff and to satisfy their responsibility for her safety and well-being.

115.    Plaintiff was housed in an environment infested with vermin, including cockroaches and mice. She observed cockroaches in the housing unit, found cockroaches in her bed, and was forced to live in close proximity to unsanitary and pest-ridden conditions for an extended period.

116.    Plaintiff was also exposed to black mold in cells, ceilings, showers, and common areas, as well as recurrent flooding and overflowing toilets. Cleaning materials were inadequate or

19

unavailable, and dirty mops were repeatedly used on contaminated floors, exacerbating the unsanitary conditions.

117. The food provided to Plaintiff was frequently spoiled, inedible, and at times infested with weevils, maggots, or other contamination. Because she could not safely or reasonably consume the meals provided, Plaintiff was forced to subsist largely on commissary snacks for roughly three and a half months.

118. Plaintiff was regularly exposed to synthetic-drug smoke, including K2, from other inmates. That exposure caused Plaintiff severe migraines, headaches, nausea, and ongoing distress, yet staff failed to stop, report, or meaningfully respond to the drug use.

119. Plaintiff was further subjected to unsafe and degrading living conditions, including inadequate bedding and clothing, freezing temperatures, shoes that did not fit, assignment to an upper bunk despite her age, denial of ordinary hygiene items, lack of clean clothing, and no meaningful access to sunlight for the entirety of her incarceration.

120. Plaintiff also observed unsafe electrical conditions, including torn or damaged outlets and exposed live wires, and lived in constant fear of electrocution or fire while locked in her cell.

121. The foregoing acts and omissions constituted negligence under Pennsylvania law.

122. Defendant knew or with reasonable diligence should have known of the complained-of conditions.

123. As a direct and proximate result of Defendant United States' negligence, Plaintiff suffered physical injury, pain and suffering, emotional distress, humiliation, anxiety, loss of dignity, aggravation of preexisting medical conditions, and other compensable damages in an amount to be determined at trial.

## AS AND FOR A SEVENTH CAUSE OF ACTION
*(Intentional Infliction of Emotional Distress - FTCA)*

124.    Plaintiff repeats and realleges all prior paragraphs as though fully set forth herein.

125.    Through its officers, agents, employees, prosecutors, investigators, and correctional personnel acting within the scope of their employment, the United States engaged in extreme and outrageous conduct toward Plaintiff, intentionally or in reckless disregard of the near certainty that such conduct would cause severe emotional distress.

126.    That conduct began with Plaintiff's arrest on June 28, 2021, when approximately eight to ten law-enforcement officers, including FBI agents accompanied by local police, arrived at her Pennsylvania home with rifles and a riot shield, taped over her home surveillance camera, handcuffed and leg-shackled her, despite no evidence or knowledge that Plaintiff was dangerous, would resist arrest, or was a flight risk. Plaintiff remained shackled for approximately nine hours before learning the nature of the charges against her.

127.    The emotional harm inflicted by that arrest was compounded by the Government's continuation of a felony prosecution under 18 U.S.C. § 1512(c)(2), notwithstanding Plaintiff's brief, non-violent conduct, which lasted approximately eleven minutes, and despite the Government's possession of information inconsistent with any corrupt intent to obstruct an official proceeding. Plaintiff remained under criminal process and restrictive supervision for approximately two and a half years, during which she was required to report regularly, restricted in her travel, and subjected to conditions including drug testing despite no history of drug use.

128.    The Government's conduct further escalated when, after sentencing, Plaintiff, who had expected designation to a minimum-security women's facility, was instead sent to FDC Philadelphia, a far more restrictive institution

21

129.    Taken together, the armed and humiliating arrest, the prolonged maintenance of an inapplicable felony prosecution, the resulting public vilification and threats, and the later exposure to degrading confinement conditions constituted a sustained course of extreme and outrageous conduct that no reasonable person should be expected to endure.

130.    As a direct and proximate result of Defendants' conduct, Plaintiff suffered severe emotional distress, including anxiety, panic, humiliation, fear for her safety, insomnia, chronic stress, and ongoing psychological trauma. She also suffered associated physical manifestations including migraines, nausea, and other stress-related symptoms that persisted during and after her confinement.

131.    The conduct described herein exceeded all bounds usually tolerated in a civilized society and constitutes intentional infliction of emotional distress under applicable law.

132.    By reason of the foregoing, Plaintiff is entitled to recover compensatory damages, costs, disbursements, and such other and further relief as the Court deems just and proper.

**WHEREFORE**, and for the foregoing reasons, Plaintiff respectfully requests that the Court enter judgment in the Plaintiff's favor,

a. Awarding compensatory damages to the Plaintiff, plus post-judgment interest;

b. Awarding punitive damages to the Plaintiff;

c. Awarding Plaintiff reasonable costs, disbursements, and attorney's fees; and

d. Awarding any such other and further relief as this Court finds is required in the interest of justice.

Dated: August 5, 2026
New York, New York

Respectfully submitted,

**RAISER, KENNIFF & LONSTEIN, P.C.**

By: *Jonathan Crisp*
_____
Jonathan Crisp
666 Old Country Road, Suite 509A
Garden City, NY 11530
Phone: (516) 742-7600
jcrisp@crisplegal.com

23